We have cases 418-05-16 and 418-05-75. They've been consolidated. For the appellant, and I realize we have two appellants in this matter, but we have Mr. Rubery, is that correct? Is it Rubery? Rubery? How do you pronounce that? Rubery. Rubery? All right. And then for the appellee, we have, is it Ms.? Okay, Mr. Chris Henson and then Ms. Maya Mayberry, is that correct? Yes, ma'am. And Mr. Henson, you will be doing the arguing, is that correct? Correct. Okay. Mr. Rubery, you may proceed. Thank you, Ms. Mayberry. These court counsels, I'm appearing on behalf of the Illinois Alcohol & Other Drug Abuse Professional Certification Association, Inc. With your permission, I'd like to use the acronym. Otherwise, I'm going to twist my tongue around. If my client sees me, I'm going to be nauseating. That would confuse everybody, including myself. So bear in mind, the issue of whether a contract exists is typically reserved for fact. But that didn't happen in this case. The circuit court decided on its own to determine whether there was a binding or planning contract between my client and Ms. Mayberry. The giveaway is at page two of the court's decision on the judgment, which is at C-18-23. And the court says, in ruling upon the issues, the court must make two determinations. First, whether a contract with one of the existing parties. Second, if so, a determinate plan for the plan of contract was honored. That was not the court's role. The court's role was to look at the record, listen to the argument, review the testimony. The main determination was whether there was evidence sufficient to submit the matter to a trier of court. In other words, the court said, in order to order summary judgment in this context, the circuit court would have to find, as a matter of law, no reasonable trier that could find that a contract did not exist. In the order, there's nothing in the order which even remotely suggests that the court engaged in that particular inquiry. It did not. What it did is, it acted as if this was a trial in the papers, which occurs sometimes in federal court. The parties agree, no, we're going to do summary judgment, but given the nature of the case, we're going to try it on paper. We're not going to have a whole dress trial. Well, nobody agreed to that in this case, obviously. I don't mean to get in the way of the law. You don't have to allow us to do that. That said, what the circuit court did was weigh the evidence and determine if the contract existed. Now, what evidence did the court actually review? What's striking about this case is nobody, and I mean nobody, stood up and said, yeah, you know, on December 2nd, 2009, we decided to alter Mr. Johnson's advocate relationship. Mr. Johnson didn't say that. Mr. Johnson never said, yeah, December 2nd, 2009, in exchange for my giving up my existing title, I obtain a guarantee of full employment through December 31st, 2012. He never said that. You might be asking yourself, why did he say that? Well, he was pretty much precluded from saying that. Why? In his deposition, he was asked, you know, what happened during this December 2nd, 2009 meeting? Was there a discussion of guaranteeing your employment through December 31st, 2012? The answer is no. Well, they weren't even talking about it. So the circuit court basically looked at the resolution and decided that's a contract. But that was not the circuit court's job. To the extent it's anyone's job, that is the job of the trier of fact. After the trier of fact was released, the opportunity to listen to witness testimony would be denied. That didn't happen. And that's why this case should go back to the circuit court. So we have a trial on whether the parties intended to form a contract. And the other thing that's not addressed in the order is intent. Typically, intent is a question of fact, especially where you don't have a document that is labeled a contract. Now, if Mr. Henson and I decide I want to sell a piece of property, there's a written real estate contract. In that context, those circumstances, intent is not a big issue. It's pretty much there. I sign, he signs, there's a written document, end of story. But when you have a situation where someone is saying that promises were made, but it's sort of not direct and explicit, intent is very important. Now, how do you determine intent? Well, you look at the words the parties used, you look at the circumstances, and you look at the parties' conduct. Let's look at Mr. Johnson's conduct. March 23rd, he sends a letter to my client. Well, my client's executive director, Jesse Hays. What's that letter say? He identifies certain documents which are the conditions of his employment. What are they? They are a series of letters he exchanged with a gentleman by the name of Gus Eber, who was IODACA's president in 1994. Those letters, obviously, were exchanged in 1994, and they obviously have nothing to do with what happened in December 2nd, 2009. But this is what Mr. Johnson identified as the conditions of his employment. Not the resolution. Now, counsel can stand up here and say, well, yeah, later he sent an email, or the same day he sent an email saying, no, the resolution under which I'm working can't release the records today. All right? So, you can argue that in front of a jury. But, obviously, the evidence is in conflict. Evidence in conflict is not resolved by a summary judgment. Here, the Circuit Court can even consider, the Circuit Court can assume, assume that this was a contract. Let's look closely. It looks like a contract. Sorry, when you look at the minutes typed up, it all looks like it's interrelated, doesn't it? Well, who said it was? Who said that, yeah, the setting of the retirement date, that is connected to the new title. Who raised his or her right hand and said that under a no vote? That's what the Circuit Court found. But there, again, the Circuit Court made some assumptions here. The Circuit Court reviewed, analyzed the evidence. But it went a step too far. So that's why I think the contract issue has to go back. For this reason alone, just the formation of this. But then we have consideration. What's the consideration? Well, in dealing with Mr. Johnson, consideration, it seems like, depends what day you catch him. Initially, consideration was, he gave up his job and job duties. I don't believe it happened, but you notice there's never been any specifics as to the when, where, how, and why. They just throw that out there. It turns out they do that. But does that win the day on summary judgment? No, it doesn't. Now, I understand. Consideration, unlike formation, is a question of law. There's no argument there. But here, it's ever-changing. It started out as, like I said, losing his old title and old job and losing duties. But then we look back, well, if that happened, it happened five months before the contract was allegedly formed. And as this Court has held going back to 1984, I think it's a Warner Agency case, consideration that is tendered or offered or promised, tendered or offered before the contract is formed, may not serve as, is insufficient as a matter of law. That case is cited to this day. It's cited for 35 years. I remember looking at it when I was in law school. I've been out 35 years. Mr. Ruber, before you get too far from the formation issue, in the trial court, did you, did your client provide written argument, oral argument, if there was a hearing on the Dooling summary judgment motions, in regards to summary judgment not being proper in regards to formation? Yes. That was addressed? I believe the argument is a question of fact. Okay. And that summary judgment would not be appropriate at that time. Right. Did the trial court's order address that? I don't believe so. Okay. I mean, we certainly raised it in the motion to make it, and we admonished it, I would say. But as far as intent is concerned, that was never addressed. And, again, that leaves us for consideration. And so that can't serve as consideration, that alleged loss of position and job. I mean, it's just two months, five months. The trial court said, well, you know, it was reasonably close. But I'm not aware of that being an exception to prior consideration. There are a series of exceptions, and they're set out in the board of judges. And that is not one of them. Five months is a relatively short period for the trial court. But that's it. But then the next level of consideration is, well, he gave up his ability to work for the local level. You know this isn't usually a right. When he says ability, well, what does that mean? That's an issue. He did not have a legal right to work. He had no contractual right to continue to work. I mean, that's memorializing for compensation. His employment is at will. So the fact that he wants something, he wanted to do something, that's, he's giving up something that's really, that's not sufficient consideration, given the fact that he's already an existing employee. So those two cases, Grooney and McCorder, really had no application, because those are about new hires. He's an existing employee. So the second, I guess, version of what constitutes consideration fails as well. Then we went back and forth with the idea that, well, he had a new title. Where's the evidence that shows that, confirming the new title is somehow related to the alleged promise of guaranteed employment? Nobody testified. So that's it. That leaves us with, well, the circuit court on the motion to vacate, and we pointed out the way that the consideration that's identified in the original order is insufficient and non-existent because it occurred prior to the formation of the legislature. The circuit court decides, well, he was going to help out during the transition. Nobody testified. And as far as the transition goes, you don't see that mentioned in any of the papers. Well, obviously not in the transition in exchange for a guarantee term. Nobody said that. Nobody implied that. I understand. The question of consideration is a question of law. But I don't believe that you support a free voting commission, when you basically look and find consideration that no one in a case even remotely considered. So I believe that this court should reverse Brown's consideration, and I don't think they can ever do consideration. I don't think they can. They've had every opportunity. How many briefs did they file? I mean, it gets to a point where you spend your allotment of briefs and opportunities to identify consideration for an agreement, but it's not an ongoing search or exploration. I mean, they've had their opportunity, and I think the reason alone, I think, there's probably no consideration. I believe there is no contract. There's no contract, but I think the assembly judgment should reverse it, and the judgment should be in favor of my claim. And then we move on to Kate and John. Counsel, if I could just go back for a minute to the question that was asked by Justice Harris. Although you say that the issue of cross-motion for summary judgment and what effect that might have is something that was argued ad nauseum, how come you don't mention it in your brief at all? In your standard review, you don't mention anything about the body of case law that talks about the effect of cross-motions for summary judgment, nor do you indicate at any time in your argument that there was any issue with regard to the cross-motions for summary judgment, nor do you point out that you had a motion to vacate that specifically addressed that issue. Did I miss that somewhere? No, I misunderstood, Justice Harris. In your argument standard as far as what formation requires. Okay, well, if that was his question, I guess I'm changing the question. My question is, in looking at your brief, there's absolutely no acknowledgement that these were cross-motions for summary judgment, which would normally then indicate that the parties are in agreement that there's only questions of law yet to be decided. You don't talk about that at all. No, we don't. But supposedly that was all raised in front of the trial court. What was raised was that there were issues of fact in any of our argument as to whether there was a conflict. And on what basis were you seeking summary judgment? We were basically saying that his employment was at will, there was no consideration to alter that, and that those minutes did not constitute a contract. That's what we were arguing. We specifically argued that he's an at-will employee. Where's the evidence that the at-will relationship is holding? Where's the evidence that the parties intended to do that? So you were wanting the trial court to conclude based upon those references to make the legal determination he was an at-will employee. We wanted to make the guess that he was an at-will employee. They wanted the trial court, based on their references, to make a finding that he was actually a contractual employee. Yes. And those were your cross-motions. Yes. Those were the cross-motions. And we cited you on other things. I mean, there were briefs that went to the end. There was a brief on counter-contract at the end. And we argued on other things. And the way that this is for a compensation agreement, it says he's an at-will employee. How does that change? I mean, that's one of them. So you both filed motions for summary judgment. You asked the trial court to make a legal determination as to what his status was. And now you're arguing that it was error for the trial court to do that. I do, because it was not evidence to support the point that you're just not there. I mean, I believe we should have won summary judgment. If the trial court had granted your summary judgment motion, would the opposing party be able to say what you're saying here, that you, in fact, disputed matters of fact that precluded the entry of summary judgment? This does go back to what I was originally asking. Were these to be treated as true cross-motions for summary judgment, not a common issue? Which, if it was from your standpoint, would be an acknowledgment that the trial court possessed the ability to make that determination as a matter of law? Well, I can tell you I filed a motion for summary judgment first. I didn't know he was going to file one. There was no discussion. We were doing cross-motions. I can tell you that. There was a deadline. It was originally set. I met that deadline. The opposing counsel filed this later, including the court. But I can tell you it was not my intention to say these are cross-motions. I filed it first. I mean, I can't stop you from filing your own motion. I can't do that. I didn't anticipate it would be part of this. But your client's summary judgment motion dealt with the issue of formation of contract, that there was no contract form, correct? Yes. Basically, he was an Atwell employee. And it's, you know, he's Atwell. Obviously, there was a conversation there. And also, I point out, in his original brief, you know, he attaches an exhibit. He's a Johnson's attorney. And the agreement was the deferred compensation, which has an Atwell provision. So I know he corrected that later, but that's, you know, what we originally got. So, you know, we filed the summary judgment. And, you know, I believe that we were entitled to it. But if I believe that we decided it was a matter of law based on the record that they created, then I don't know. Because remember, they had a verbal proof of the statute of conduct. But I think maybe our confusion comes from the fact that you started out arguing that the court didn't even have the authority to make that legal finding, when, in fact, it looks more like, no, you just didn't win it. Well, I don't think the court had the authority because there was no evidence to support it. I understand. I don't want to belabor it, but you just didn't win it. You just didn't win it. The facts don't support it. Well, no, they didn't have the facts to support theirs. Right. No, that's what I'm saying, is that you're saying the facts just didn't support the conclusion. There was a contract. Not that the court didn't have the authority to make that legal determination, because you each asked for a legal determination in your summary judgment motions. On that exact issue. I can't argue with it. Okay. You have until the red, but counsel, I'm still a little bit confused, because I guess for me, you have the cross motions. You're here today arguing that there's a question of fact. Did that question of fact exist with respect to your motion as well? I mean, as Justice Harris indicated, if you had one, does that remedy the question of fact that you now say existed? I don't believe so. No, I believe you should have one, yes, because they never put together evidence that shows that this particular, these meeting minutes were the contract. And that was their verdict. They never did. They basically said, look at these minutes, aha, this is agreement, and that's it. There was no testimony to support that. And they have to do it. They just can't take a document out that's not a legal contract and say, oh, it's a contract, by the way. We said it was not. And at no point did you withdraw your motion for summary judgment or suggest to the court that this is not an issue that should be resolved by the court, but it's an issue of fact that needs to be resolved by the jury? I didn't withdraw it, but I do know that you did submit closing briefs in which you said, you know, there are questions of fact. And this was after the argument. Okay. So we did make these points, and those points were made before the decision was made. Thank you, counsel. You're currently out of time. You will have additional time on rebuttal. Thank you. Thank you. Mr. Henson. Good morning. The majority of Mr. Gruber's argument is new to me with respect to the issues that you brought up. Clearly, this entire everything that we filed, we indicated to the court that you were going to do so. And I do want to correct a couple issues about the indication that there was no formation and intent. The December 9th EC minutes in the October 2010 resolution, reading from the 2009 EC minutes, this is directly from the document. Bill will be Director Emeritus effective immediately until such time as he retires. Subsequently, in 2010, there became an issue because Bill had so many sick days. And in the 2010 resolution, it said commencing January 1st, 2011, and ending December 31st, 2012, Bill Johnson will work and will use X number of sick days. Now, Bill didn't have a chance to use those sick days because they fired him. But that is a clear, and that's from the documents. This doesn't have to be inferred. This is just from the reading of that. That's in the documents that he had to work for most time. A number of issues regarding the contract brought up. As you know, it's unquestionable that Bill's intent was to work X number of days. By the way, one point that I think is very important when mentioning the fact that Bill's job really didn't change. It was a change in title only. I asked Valerie Arnett, who was the president of IAF at the time, I said, how did his job duties change at the time of this EC meeting? And she said, essentially, he went from executive director to a consultant. And the argument is there weren't any change in duties. I cannot think of a larger change in duties when the president of the organization said, yeah, he was our executive director, but then he became your consultant. Well, I guess we're talking about, as opposing counsel said, a title versus actually duties. Correct. You can call it whatever you want, but then you have to analyze what are the duties. Yes, and that, in fact, was in the 2009 document, there was reference about how Jessica Hayes, who took over the job, what she would be doing in lieu of what Bill had been doing. There's a notion of going to him for questions, him looking to hold. That's directly in the document, in addition to the other. And this is the same meeting where Bill became what Valerie Arnett said was a consultant. They were, in fact, talking about duties. And they indicated they had problems because nobody knew where the buck stopped. They needed to know who had the duties, who had the authority in this situation. So I've heard several times mentioned that, oh, there was nothing dragged out there. You know, he was an employee at Will. There was no problem. It's actually in the document that there was a problem in transition and that nobody knew where the buck stopped. So it wasn't just the title. Jessica Hayes took over the job that Bill Johnson had as executive director. So it was duties as well. I would like, moving on to some other issues that weren't addressed, but I think that are very important, going to his termination. At the time he was terminated, Bill was working for IAPTA in Pasco, and he received an e-mail indicating you're terminated immediately. They now offered what they entitled was a sentence package, which was a portion of his vacation pay and a portion of his sick pay if he would give up all of his remaining rights. Well, those remaining rights were his deferred compensation, his retirement. He worked for this organization since 1994. If he had signed this sentence package, he would have effectively written away his opportunity to receive $100,000 that he had been planning for for years. And in fact, although IAPTA never mentioned a reason why they should not have given him that package at that time, I'm talking 2001, it was not until 2018 that they handed over the check. And I brought this up to the judge. I said, Judge Felt, if you want to ask him why they held that for seven years, I will welcome you because I have no idea. And I still don't have any idea after seven years. There was a letter in their agent's package, a different package, his retirement and insurance and that type of thing. After Bill turned down this offer of waiving away his deferred compensation right, an attorney for IAPTA wrote to the agent that we will not sign this over to Bill Johnson. Now, nor will we ever. And there is not a single reason, not a single legal reason that they should have held on to that package. And they still have not provided an answer. And if we could get one to hear, it would be great. Because my client is 78 years old and I have to explain to him why he doesn't have his retirement. I didn't get it until 2018. There was an attempt in November of 2019 where IAPTA offered money for, offered actually checks for vacation and sick pay. And Bill turned it down. And IAPTA understandably made a big issue about this. They said, hey, we sent the check. But keep in mind from the very beginning, this was a sham. Bill testified. And Judge Belz relied upon this as to why he didn't negotiate that check once. It said nothing about deferred compensation. The totals were correct. There was no interest on this. I didn't trust him at all. And of course subsequently he found out all sorts of things. The totals were correct or incorrect? What's that? The totals were correct or incorrect? The amount that the child's computer was owed at that time, the amount that they had offered was correct. It was the amount, but it wasn't as much. Jessica Hayes actually submitted an affidavit that she said she had gone to Bill Johnson many times to have him fill out this paperwork. My client would jump over walls to sign it. I don't know how she could have done that many times given the fact that she fired him via email. She eventually went through that. She indicated that she didn't know that Bill was asking their insurance agent for deferred compensation. Well, lo and behold, they subpoenaed the documents from the insurance company. And Jessica Hayes had more than one conversation. She knew about it. So Judge Bells indicated this is a very limited holding. I want to make this clear, that this holding with respect to not accepting those checks, I'm not saying employers, if they don't send the correct amount, shouldn't receive credit for it. In fact, I've gone so far as to say the majority of families should. If they're making an effort to do things right, they should receive credit for it. But when you have behavior such as that exhibited in this case, this extreme, with so many violations of GAAP, Judge Bells indicated that Bill's testimony was more credible. And he understood why it was not the first hearing. I think it's important for the court to indicate that in Illinois, companies cannot do this. Because allowing you to get credit for a short check months later without the deferred comp, which didn't come until 2001, after he's paid hundreds of thousands in attorney's fees, they should not seek to gain from that. All he was seeking, all he's been seeking here, was the remainder of the contract, the sick pay, the vacation pay, and his retirement, his deferred comp. Instead, this has turned into, I'm beyond supportive of explaining to my client what's going on and how our system works and everything. I can't explain. They did pay in 2018. It took seven years of litigation to get to that point. And I'm sure you've seen all the briefs for what should be a very simple case. The issues, if you look at it, just at the time, seem very easy. Okay, is he owed the vacation pay? Yes, as a matter of law. Everybody in here agrees. Sick pay? Yes, everybody agrees. Deferred compensation? Yes, everybody in here agrees. Including my dad. And that wasn't good. The one part that could be, could lead to litigation, would be the breach of contract. Because they could make the arguments, let's say, to compare it to, at least you could say, hey, there's some basis for this. And they could litigate that. But that's a tiny portion of the money that we're talking about here. A couple other issues, Your Honor. He mentions, or excuse me, IDAPA mentions that this was not a material breach. The issue of material breach is salient because if, under this agreement, IDAPA commits a material breach of agreement, a deferred compensation agreement, then they do not get to elect how to pay out the benefits. So in our very first opening motion for summary judgment, we did it right on the net. We addressed the grand court case where it said, hold the draft, pay for 14 weeks, is a material breach. We're talking multiple years here. And not a single time did I have to address it during all those pleadings. They mentioned probably the damages here, which was the very last evidentiary hearing, that we tried to bring it up, but the judge cut it off. But if you look at what they cited to in the brief, to me there's nothing in there that indicates that he was talking about a material breach. And furthermore, there was no longer proof. So what is the court to rule on? What might have been asked and what might have been answered, and therefore should be remanded after they did not answer at one time in a single brief? And again, the effect of that is two ways of payment for the deferred compensation agreement is one sum or one tenant per year for 10 years. I had to ask for one sum or one tenant for 10 years because this is final compensation and there's no additional attachment to it. If they're allowed to pay out for one tenant for 10 years, that's a lot less interest they have. What I'm saying is they committed a material breach. They do not get to make that decision. In fact, it hadn't been argued. Attorney's fees, just to give you an idea, I adapted what was allotted seven months of discovery on attorney's fees in this case. Seven months. Just on the issue of attorney's fees. What happened? No depositions came. There were motion to quash this from people, from attorneys in my old firm who worked on the case back in 2012, 2015. There was an evidentiary here. There were brief summaries. The judge went over all of this, and not only the original one, but the motion that they gave. And I'm left to ask, what more do they want? Judge Belz has seen the attorney's fees left and right. He's seen what has occurred here. He's seen and heard the witnesses testify. What else do they want to prove the attorney's fees? If Judge Belz thought I was running up the bills, he could have certainly said, oh, this wasn't done. And he did reference the objections. There were objections made to it. And I'd have to have more than ample opportunity to explore that. Are the parties in agreement that there was no market analysis offered to the court in terms of the attorney fees? Yes, Your Honor. We did not locate a market for IWPCA claims in Saginaw County. And that led me to look, okay, let's look around here. We can find an analogous county. And we've got a Rock Island county in the Paylar case. Interestingly, in the Paylar case, the amount of money it was taking was $266. I have no objection to it. God knows what. But the Paylar market, in that case, the attorney went through it. And provided an affidavit from the attorney for not a year just because there wasn't a market. And that attorney said- Well, did your expert, your attorney who you provided the affidavit for, did she provide a market analysis amount? No, not for Saginaw County because there wasn't one. So she used- And so does it ultimately come down to reasonableness? Reasonableness is a major factor. In fact, that's a good point. The judge at the end of the Paylar decision, if you look at that, and that's what it is. It is reasonableness. There's an argument in here about the way the money has to be paid back at the contract rate, which was $200,000. The publication of the Illinois Supreme Court specifically said, no, that was not the basis. It's the reasonableness. And did Judge Bells make a determination based on what he determined to be reasonable? Yes, but he did not address the Paylar case. He did not address the Paul case. The $250 an hour only could have come from that contract. And, in fact, that's what the argument to Judge Bells was. But did he indicate in his decision about the attorney's fees that he was relying on that? He didn't say where he would have done it. It's just one paragraph. He did mention the reasonableness and some other factors he considered, right? He said that he found it to be reasonable. I forget the exact vernacular. But, yes, to answer your question, he did come to that decision. The reason that I thought it was arbitrary was because there was nothing to indicate that he followed any of the analysis. And, in fact, if you face the $250 an hour, that only could have been realized by the attorney fees, which is what I adapted. I would also indicate my pro counsel here, Mia, we have $250 an hour as a general amount to bill. But that's what he's going to afford to pay. Mia Bell wants $160 an hour. She is new and experienced in this matter, and that's reflected in her hourly rate. So in Pay Bar, the attorney you had, I believe, seven more years' experience than I did, she was awarded $400 an hour for interest of $266 where she prevailed on one of nine claims. Could Judge Belch have relied on his own knowledge of attorney billing rates in the Springfield area? He could have. I didn't see it in the record. It was simply mentioned. Well, he cites Paylar on page 3 of his 12-page order. What's that, Jerome? He cites Paylar on page 3 of his 12-page order addressing... And you're saying that nowhere in that 12 pages does he give any reason or rationale for how he comes to this decision. Well, counsel, even in the Palm case, which you rely on heavily, they talk about that it was appropriate in that case to set the fees where they did based on the prevailing market rate for attorney services. But we didn't have that. Judge Belch didn't have that. Is that correct? That's correct. And that's why I said Paylar, because Paylar and the judge said the same thing. We have no market here. The judge has to come up with one. And based upon the information provided, and keep in mind, I adapted and didn't provide anything other than the contract. The court said, based upon the evidence provided to me, $400 is appropriate. I see that. Yes, you are, counsel. You will have additional time on rebuttal as well, if you so desire. Thank you. Mr. Ruberi, you have rebuttal. Thank you. One thing I'd like to get out straight right away is that the first compensation is deferred compensation. It's not just because of retirement. You have retirement benefits. I'll point that out in a brief. As far as the award for the unused state of the location, I think Mr. Ruberi turned the statute on its head and requires us to prove the circumstances in the context of the payment. Now, in evidence is a memorandum identifying the number of hours and the amount. And Judge Belch concluded, well, he never cast a check, so he won't be paid. The statute talks about underpayments, and the statute does not create a perfect tender. In other words, if you're $50 off or $5,000 off, which you may be when that employee leaves, the employee will sue you for the underpayment. That's what the statute specifically says. But if we accept Judge Belch's reasoning, that essentially means that the plaintiff can just sit back and collect interest on his behalf and say, well, you didn't give me everything I wanted. Even though I had the money, I'm going to hit you with the entire amount I was due, even though that money was in my name. This notion that he was sitting at home and his check showed up and he didn't know what it was about or he wasn't sure he was getting his rights, that doesn't hold water, book it, or bill it. That's one thing he would say to that defendant. Did they send with the check a detailed explanation of what the check was being used for? Yeah, it said if the hours broken down, days, so many hours, I can't remember what the amount was. Let's say, just for example, 1,500 hours for unused vacation. 1,500 hours, whatever, for unused sick leave. So it's there, and it's in evidence. And it's something that was produced after Mr. Henson demanded that he write it. So they responded. Were they late? Yes. We're not taking issue with the court's determination of the amount of days. What we're saying is we should have received a credit for the amount that was taken. If it was late, yes, but it should not have been treated as an amount. That's what the court's treatment is. What's the alternative? We show up in this house with a money-counting machine, and start paying on cash. We can pull $76,000 out of our account in cash. That would be interesting, I think. There's some banking and reporting regulations that might be located there. Or maybe you indicate in the paragraph that by accepting this check, you're not waiving any other claims that you may have against the entity. Well, I think the thing is, this one's for the winner. So it's not as if this guy's on his own. So I think that it says what it says. Well, IDAPT or whatever it is has lawyers too, right? They probably authorized them to send the check, didn't they? They did. So why not include a paragraph that says, by accepting this check or these amounts, you're not waiving any other claims you may seek to have against the entity? Well, that would probably be a good philosophical argument. Then we wouldn't have even had this issue, would we? It would be much easier to deal with. But I'd still say that if you receive this kind of information, as for the attorney's fee issue, I get to hear counsel explain how the Circuit Court gives discretion. When you look at the brief, it's all about me and what I've argued. Well, I gave the decision. There's nothing in there to remotely suggest that the Circuit Court gives discretion on this particular issue. They asked for there being no market here in San Diego County. No one testified on that. It's an argument. I find it difficult to believe. The state cap is on the street. I think there's a significant amount of litigation. So basically saying there is no market. Well, was any evidence offered to Judge Bells with respect to the market analysis and what the market rate was? Did I offer any? No. Did anybody? No. Nobody did. What Ms. Hubbard did is just offer what the federal courts call an inadequate integrated job issue. That's not being established. There's a market rate that Mr. Witzman has been practicing longer than Mr. Henson has tried to tally, $175. So I think the Circuit Court has acted well with discretion on this particular issue. As far as Mr. Johnson being a consultant, that is testimony that Mr. Henson lifted, but the question wasn't asked in such a way as it was. On December 2, 2009, was he a consultant? That's not the question that's asked. Mr. Henson asked a series of questions about Mr. Henson and she said he was a consultant. Counsel, you're out of time. Thank you. Mr. Henson, any rebuttal? Just a couple matters. It was indicated on the record that I performed a search, a market search, in Sagamore County. I think that's because there was a market before that. But you were unable to find anything with respect to this specific area. Is that correct? Am I remembering that correctly? That's correct. And it's in the record before Judge Bell's. Unless the court has any other questions. Thank you very much. Thank you, counsel. We'll take this matter under advisement and be in recess at this time.